# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 09-CV-01680-DME-MEH

CORUM REAL ESTATE GROUP, INC.
AND 1800 MARKET INVESTORS, LLC,

      Plaintiffs,

v.

BLACKROCK REALTY ADVISORS, INC.
AND 1800 MARKET TOWER LLC,

      Defendants

                Consolidated With

Civil Action No. 09-CV-02804-DME-BNB

1800 MARKET TOWER LLC,

      Plaintiff,

v.

V. MICHAEL KOMPPA,
      Defendant.

---

## ORDER DENYING DEFENDANTS BLACKROCK REALTY ADVISORS, INC. AND 1800 MARKET TOWER LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)

---

Plaintiffs Corum Real Estate Group, Inc. ("Corum") and 1800 Market Investors

LLC ("Investors") entered into a number of agreements with Defendants BlackRock

Realty Advisors, Inc. ("BlackRock") and 1800 Market Tower LLC ("Tower") concerning

the development of a property located at 1800 Market Street in Denver, Colorado.[1]

Plaintiffs contend that Defendants broke several promises they made to Plaintiffs over the

last several years and otherwise failed to act in good faith in relation to the development

of the property. Defendants move to dismiss Plaintiffs' Amended Complaint for failure

to state a claim on which relief can be granted. For the reasons that follow, the motion is

denied.

## I.    Factual Background

For purposes of this motion, the court accepts as true all well-pleaded facts

contained in the complaint. See Moss v. Kopp, 559 F.3d 1155, 1161 (10th Cir. 2009). In

2004, an employee of BlackRock, a global provider of investment and risk management

services principally owned by Bank of America, PNC Financial Services Group, and

Barclays PLC, approached Corum about jointly developing a high-rise residential

property in downtown Denver. (Am. Compl. ¶¶ 3, 7.) Blackrock suggested that Corum,

a Colorado-based real estate development and management company, identify an

appropriate property for the development. (Id. ¶¶ 1, 7.) Corum chose 1800 Market Street

in downtown Denver as the best available property, and in July 2004, negotiated an

agreement with the owners to purchase the property, subject to Corum obtaining approval

for the development. (Id. ¶ 8.) Over the course of the next sixteen months, Plaintiffs

---

[1] This case has been consolidated with 09-cv-2804-DME-MEH, in which Tower is the
Plaintiff. This opinion addresses only the Amended Complaint from 09-cv-1680-DME-
MEH, however, and so the court shall refer to Corum and Investors as "Plaintiffs" and
BlackRock and Tower as "Defendants."

sought and received approval to build the development at 1800 Market from the city of Denver's Lower Downtown Design Review Board by working with the Board, Defendants, and architects. (Id. ¶ 9.)

According to Plaintiffs, "Plaintiffs and Defendants agreed to jointly develop 1800 Market . . . into a high-rise residential property and to share the resulting profits and losses with a 75/25 split after paying expenses, a development/management fee, and interest on capital." (Id. ¶ 10.) In October 2005, Investors—a company whose only members are Corum and a single individual, V. Michael Komppa—purchased the property "based on Plaintiffs['] and Defendants' plan to jointly develop the property." (Id. ¶ 11.) As outlined in the Complaint, Plaintiffs acted as the developer of the project, while Defendants acted as the "money partner." (Id. ¶¶ 12-13.) Defendants provided approximately $9.56 million to Investors in the form of three Promissory Notes (with related Deeds of Trust) and an Option Agreement. (Id. ¶ 12.) This money funded the acquisition of the property, as well as approximately 75% of predevelopment expenses. (Id. ¶ 12.) Plaintiffs provided the remaining 25% of the predevelopment expenses, expending approximately $1.2 million in capital and $2.2 million in uncompensated time and labor associated with the project. (Id. ¶ 13.)

In early 2006, the parties agreed that Defendants would provide approximately $80 million to fund the development, while Plaintiffs would provide only $2 million, but act as the primary developer. (Id. ¶ 15.) The Complaint does not state whether the

3

parties ever memorialized this particular agreement in writing. The next event identified by the Complaint occurred in March 2007, when the parties executed a letter of intent, which provided that Defendants would contribute approximately 95% of the $36 million that would be needed by the "Take-Out-Entity" the parties agreed to form upon completion of construction, with Plaintiffs providing the final 5% of the funding. (Id. ¶ 16.) The following month, Defendants decided to abandon the project, informing Plaintiffs that the development did not comport with Defendants' vision and suggesting that Plaintiffs find another partner. (Id. ¶ 18.) The parties later entered into a Forbearance Agreement, primarily intended to enable Plaintiffs to find a new money partner for the project, that stated that Defendants would forego rights and remedies they thought they possessed under the Promissory Notes and other documents. (Id. ¶ 19.)

In the fall of 2007, Defendants contacted Plaintiffs and informed them that, after reviewing investment opportunities nationwide, Defendants again wanted to proceed with developing 1800 Market. (Id. ¶ 20.) In December, the parties executed a second letter of intent that reiterated the terms to which they earlier agreed regarding the formation of the Take-Out Entity. (Id. ¶ 21.) Six days later, the parties signed and executed an Amended and Restated Forbearance Agreement that included a provision requiring Plaintiffs to deal exclusively with Defendants in developing the project. (Id. ¶ 22.) This required Plaintiffs to forego a deal with Fairfield Properties that Plaintiffs claim would have earned them a profit of $2.5 million. (Id. ¶¶ 20, 22.)

4

By February 2008, Plaintiffs had completed the construction drawings and obtained approval from the City's building department. (Id. ¶ 24.) Defendants agreed with Plaintiffs that Plaintiffs should purchase building permits to avoid the possibility that costs would continue to rise and Defendants promised to pay 75% of the cost of those permits. (Id.) Defendants, however, paid only about half of the amount they agreed to pay. (Id.)

In June 2008, Defendants again informed Plaintiffs that it had decided to abandon the development. (Id. ¶ 26.) According to Plaintiffs, "Defendants acknowledged that Plaintiffs had significantly increased the value of the property," and offered to purchase the property from Plaintiffs. (Id.) The parties then entered into negotiations in which both sides offered to buy out the other's interest. (Id. ¶¶ 27-28.) Ultimately, Plaintiffs offered to sell the property to Defendants for $15,585,000. (Id. ¶ 29.) In mid-August 2008, Defendants informed Plaintiffs that representatives of Defendants' investment committee approved of the proposal, and that Defendants' counsel would prepare a purchase agreement by August 22, 2008, with a closing date of September 30, 2009. (Id.) On August 26, 2008, however, Defendants gave Plaintiffs a counteroffer rather than a purchase agreement, offering to purchase the property for $13,700,000. (Id. ¶ 30.) Plaintiffs insisted on the $15,585,000 figure, and Defendants commenced foreclosure proceedings on the property. (Id. ¶¶ 31-32.) Plaintiffs allege that Defendants used the exclusivity provision from the Restated Forbearance Agreement, which required

Plaintiffs to deal exclusively with Defendants and essentially precluded them from obtaining another money partner to develop the property, to force Plaintiffs into default on their promissory notes.  (Id. ¶ 52.)  On November 17, 2009, Tower purchased the property at a public trustee sale for $8.8 million.  (Id. ¶ 33.)

Plaintiffs filed this suit in Colorado state court on June 18, 2009.  Defendants removed the action to federal court based on the court's jurisdiction to hear cases between diverse parties.  See 28 U.S.C. § 1332.  Defendants filed a motion to dismiss the complaint for failure to state a ground upon which relief can be granted, and this court, without ruling on the merits of the motion, granted Plaintiffs thirty days to file an amended complaint, should they determine that doing so was desirable to comply with federal pleading standards.  (12/11/2009 Order.)

On January 11, 2010, Plaintiffs filed an amended complaint, in which they seek relief under Colorado law for (I) breach of fiduciary duty, (II) unjust enrichment, (III) breach of the implied duty of good faith and fair dealing, (IV) breach of contract, and, in the alternative, (V) promissory estoppel.  Defendants have again moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    Discussion

When considering a motion under Rule 12(b)(6), a court must accept all well-pleaded facts as true and view the "reasonable allegations in the light most favorable to

the plaintiff." <u>Sunrise Valley, LLC v. Kempthorne</u>, 528 F.3d 1251, 1254 (10th Cir. 2008) (quotations omitted). Courts are not required to accept as true legal conclusions contained in the complaint, however, or accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009). After separating out the legal conclusions, the court must then evaluate "the well-pleaded, nonconclusory factual allegation[s]" to determine whether they "state a claim for relief that is plausible on its face." <u>Id.</u> at 1949-50 (citing <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "Facial plausibility" requires a plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> at 1949 (citing <u>Twombly</u>, 550 U.S. at 556).

### A.    Release

Defendants initially contend that Plaintiffs' entire action is barred by a contractual release contained in the Forbearance Agreement, and Defendants have attached a copy of the Forbearance Agreement to their Motion to Dismiss the Amended Complaint. However, Defendants' argument that the release bars this lawsuit is not properly made in a motion to dismiss. The Federal Rules of Civil Procedure recognize release as an affirmative defense that should be pled in a response. <u>See</u> Fed. R. Civ. P. 8(c)(1). Rule 12(b)(6) motions, by contrast, are intended "to test the sufficiency of the allegations within the four corners of the complaint." <u>Issa v. Comp USA</u>, 354 F.3d 1174, 1177 (10th

Cir. 2003) (quotations omitted).  A court may sometimes consider an affirmative defense when deciding a motion to dismiss, but only "[i]f the defense appears plainly on the face of the complaint itself."  Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965).  For example, a statute of limitations defense may be raised in a motion to dismiss "when the dates given in the complaint make clear that the right sued upon has been extinguished."  Aldrich v. McCulloch Props., Inc., 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).  In other words, "[w]hether a particular ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on whether the allegations in the complaint suffice to establish that ground, not on the nature of the ground in the abstract."  Jones v. Bock, 549 U.S. 199, 215 (2007) (emphasis added); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (recognizing that complaint may be dismissed under Rule 12(b)(6) "when its allegations indicate the existence of an affirmative defense . . . but for this to occur, the applicability of the defense has to be clearly indicated and must appear on the face of the pleading").

Here, the release is not even referred to in the pleading, so the affirmative defense does not appear on the face of the pleading and is not properly considered on a motion to dismiss for failure to state a claim.  See Deckard v. General Motors Corp., 307 F.3d 556, 560 (7th Cir. 2002) ("A motion to dismiss was improper since release is an affirmative defense and the existence of a defense does not undercut the adequacy of the claim." (citations omitted)).  While the court has the authority to convert this motion to dismiss

into a motion for summary judgment in order to consider the release argument, <u>see</u> Fed. R. Civ. P. 12(d); <u>Wilson v. Western Oceanic, Inc.</u>, 540 F. Supp. 228, 229 n.1 (S.D. Tex. 1982) (converting 12(b)(6) motion into summary judgment motion to consider release argument), doing so here would not be appropriate because Defendants have also argued that Plaintiffs' claims are deficient, an argument that is properly made by a Rule 12(b)(6) motion, and it is possible that other challenges may be advanced against the release. Therefore, in ruling on Defendants' Rule 12(b)(6) motion, the court declines to consider Defendants' argument that Plaintiffs' action is barred by a contractual release.

**B.      Analysis of claims**

**1.      Breach of fiduciary duty**

"Before there can be a breach of a fiduciary duty, a fiduciary relationship or a confidential relationship must exist."  <u>Turkey Creek, LLC v. Rosania</u>, 953 P.2d 1306, 1312 (Colo. Ct. App. 1998).  Plaintiffs allege that Defendants breached fiduciary duties they owed to Plaintiffs as joint venturers, a recognized fiduciary relationship under Colorado law.  <u>See</u> <u>Hooper v. Yoder</u>, 737 P.2d 852, 857 n.4 (Colo. 1987) ("[J]oint venturers are fiduciaries with respect to each other and owe to each other the highest duty of loyalty.").  A joint venture relationship exists when (1) there is a "joint interest in the property by the parties sought to be held as partners"; (2) express or implied agreements to share profits and losses of the venture; and (3) actions and conduct showing cooperation.  <u>Sleeping Indian Ranch, Inc. v. West Ridge Group, LLC</u>, 119 P.3d 1062,

9

1069 (Colo. 2005) (quotations omitted).  The first and second elements often overlap, as "the joint interest contemplated is that of making a profit from shared property interests or contract rights."  <u>A.B. Hirschfeld Press, Inc. v. Weston Group, Inc.</u>, 824 P.2d 44, 46 (Colo. Ct. App. 1991).  Defendants argue that Plaintiffs failed to adequately plead all three elements.

In the Amended Complaint, Plaintiffs allege that "Plaintiffs and Defendants had an agreement to develop 1800 Market into a residential high-rise building <u>and to share the resulting profits and losses</u> with a 75/25 split after paying expenses, a development/management fee, and interest on capital."  (Am. Compl. ¶ 35 (emphasis added).)  This statement explicitly alleges that the parties had a joint interest in 1800 Market, and also alleges an agreement to share profits and losses from that building.  <u>See A.B. Hirschfeld Press, Inc.</u>, 824 P.2d at 46.  Defendants object to this allegation, arguing that Plaintiffs have not cited any written agreement that specifies a 75/25 split of profits and losses.  However, a complaint need not cite to documentary evidence to support the allegations.  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's <u>complaint alone</u> is legally sufficient to state a claim for which relief may be granted."  <u>County of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.</u>, 311 F.3d 1031, 1035 (10th Cir. 2002) (quotations omitted); <u>see also</u> <u>TMJ Implants, Inc. v. Aetna, Inc.</u>, 498 F.3d 1175, 1181 (10th Cir. 2007) (noting that at 12(b)(6) stage a plaintiff has "no obligation to

10

provide evidentiary support for its allegations").  Accordingly, the Amended Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" as to the first two elements required for the finding of a joint venture.  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).  Whether Plaintiffs can prove those allegations through admissible evidence is not a question properly presented in a motion to dismiss.

Plaintiffs have also made sufficient allegations to establish the third element of a joint venture: that actions and conduct of the parties demonstrate cooperation. Specifically, Plaintiffs allege that a representative of BlackRock approached Corum with the idea of jointly developing a high-rise residential property (Am Compl. ¶ 7); that Defendants acted as the money partner and Plaintiffs acted as the developer of the 1800 Market project (id. ¶¶ 12, 13); that the parties agreed to share profits and losses arising from the property (id. ¶ 14); that Defendants rejected the financing for construction that Platintiffs obtained, claiming that Defendants could obtain better terms (id. ¶ 23); and that the parties conferred upon and agreed to purchase building permits, splitting the costs 75% to 25% (id. ¶ 24).  Defendants contend that, rather than alleging cooperation, Plaintiffs allege only that Defendants continually "frustrated Plaintiffs' efforts to develop the property."  (Defs.' Mot. to Dismiss at 11.)  However, "the abandonment [of a joint venture] does not . . . render ineffective the prior agreement[s]" between the party and does not defeat a showing of cooperation.  A.B. Hirschfeld Press, Inc., 824 P.2d at 46.

Plaintiffs have thus sufficiently alleged that Defendants cooperated with them throughout Plaintiffs' development of the property.

Plaintiffs have adequately alleged the existence of a fiduciary relationship between themselves and Defendants, and Defendants have not argued that Plaintiffs failed to adequately allege the other elements of a breach of fiduciary duty claim.  See Graphic Directions, Inc. v. Bush, 862 P.2d 1020, 1022 (Colo. Ct. App. 1993) (listing the elements of a breach of fiduciary duty action as "1) that the defendant was acting as a fiduciary of the plaintiff; 2) that he breached a fiduciary duty to the plaintiff; 3) that the plaintiff incurred damages; and 4) that the defendant's breach of fiduciary duty was a cause of the plaintiff's damages").  Therefore, Defendants' motion to dismiss must be denied with respect to the breach of fiduciary duty claim.

### 2.    Unjust enrichment

To sustain a claim for unjust enrichment under Colorado law, a plaintiff must show that "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation."  Lewis v. Lewis, 189 P.3d 1134, 1141 (Colo. 2008).  "A benefit denotes any form of advantage."  Dudding v. Norton Frickey & Assoc., 11 P.3d 441, 445 (Colo. 2000).  Defendants argue that Plaintiffs did not adequately allege that Defendants received any benefit from Plaintiffs' expenditure of capital and labor into the project because Plaintiffs did not allege that the fair market value of the property

exceeded the amount Plaintiffs owed Defendants under the promissory notes at the time of the foreclosure sale.

Even making the doubtful assumption—which the court here makes only for purposes of this motion—that Defendants are correct that they could not be unjustly enriched if the property they received from the foreclosure sale was worth less than the amount Plaintiffs owed them, the proper amount to consider is not what Tower paid at the public foreclosure sale, but rather the fair market value of the property at the time Tower acquired it. Cf. Restatement (Third) Property—Mortgages § 8.3, cmt. a (1997) ("Many commentators have observed that the foreclosure process commonly fails to produce the fair market value for foreclosed real estate."). Plaintiffs alleged that Tower purchased the property "at a distressed fire-sale price, rather than fair value" and that "Tower reaped a windfall profit by 'purchasing' 1800 Market Street—which it valued at $18 million—for $8.8 million at a public trustee sale." (Am. Compl. ¶¶ 32, 33.) In the course of discovery, the parties will have the opportunity to determine whether the public foreclosure price was an accurate reflection of fair market value or whether Tower received the property for substantially less than its fair value, depriving Plaintiffs of compensation for improvements they made to the property. But for purposes of the motion to dismiss, the Amended Complaint sufficiently alleges that Tower received the benefit of Plaintiffs' improvements without compensating Plaintiffs for those improvements.

### 3. Breach of implied duty of good faith and fair dealing

The Complaint next alleges that Defendants breached the implied duty of good faith and fair dealing that attached to the contracts they signed. "Under Colorado law, every contract contains an implied duty of good faith and fair dealing." City of Golden v. Parker, 138 P.3d 285, 292 (Colo. 2006). The purpose of this doctrine is "to effectuate the intentions of the parties or to honor their reasonable expectations." Id. (quoting Amoco Oil Co. v. Ervin, 908 P.2d 493, 498 (Colo. 1995)).

> However, the duty may be relied upon only when one party has discretionary authority to perform certain contract terms, including discretionary acts, in good faith. Thus, a breach of the duty occurs when one party uses discretion conferred by the contract to act dishonestly or to act outside the scope of accepted commercial practices to deprive the other party of the benefit of the contract.

O'Reilly v. Physicians Mut. Ins. Co., 992 P.2d 644, 646 (Colo. Ct. App. 1999); see also Amoco Oil Co., 908 P.2d at 498. Thus, for example, the implied duty of good faith and fair dealing has been held to arise in an agreement between a franchisor and franchisees that gave the franchisor discretion to modify the monthly rental amount the franchisees were required to pay, see Amoco Oil Co., 908 P.2d at 499, and in a municipal contract which provided that the city council would appropriate funds to reimburse a developer's costs, see Parker, 138 P.3d at 292-93.

This claim is at the core of the dispute between the parties. In essence, Plaintiffs contend that their relationship with Defendants put them in a vulnerable position and that Defendants were poised to exploit their vulnerability for personal gain and "to deprive

[Plaintiffs] of the benefit of the contract." O'Reilly, 992 P.2d at 646. This vulnerability is best demonstrated by the exclusivity provision contained in the Amended and Restated Forbearance Agreement, which rendered Plaintiffs completely dependent on Defendants' good faith cooperation in order to develop the property and thereby repay the outstanding notes. Accordingly, Defendants "necessarily possessed some discretion" in deciding whether to cooperate with Plaintiffs in the development of the property, and Plaintiffs have alleged that such cooperation was contemplated by the letters of intent and forbearance agreements. See Hamon Contractors, Inc. v. Carter & Burgess, Inc., --- P.3d ---, 2009 WL 1152160 (Colo. Ct. App. 2009). Defendants' alleged decision not to cooperate, thereby forcing Plaintiffs into foreclosure, does not constitute good faith and fair dealing because it fails "to effectuate the intentions of the parties or to honor their reasonable expectations." See Parker, 138 P.3d at 292. Therefore, Plaintiffs have stated a claim for breach of the implied duty of good faith and fair dealing.

### 4. Breach of contract

Plaintiffs' breach of contract claim concerns only the alleged agreement reached in August 2008 that Defendants would purchase Plaintiffs' interest in 1800 Market Street for $15,585,000. Defendants argue that the contract is unenforceable under the statute of frauds, which provides: "Every contract . . . for the sale of any lands or any interest in lands is void unless the contract or some note or memorandum thereof expressing the

consideration is in writing and subscribed by the party by whom the . . . sale is to be made." Colo. Rev. Stat. § 38-10-108.

However, under these circumstances, Defendants may not advance a statute of frauds defense. The Colorado Supreme Court has held that "the vendee in a real estate transaction is precluded from asserting the statute of frauds against the vendor." Boyer v. Karakehian, 915 P.2d 1295, 1298 (Colo. 1996). Colorado follows the minority rule with regard to the statute of frauds by protecting the seller rather than the purchaser of land. Id.; see also Garbarino v. Union Sav. & Loan Ass'n, 109 P.2d 638, 642 (Colo. 1941) ("[T]he purpose of the statute [of frauds], so far as it relates to the sale of land, is to protect the vendor only, and the vendee, seeking to recover purchase money, cannot set up the statute against a vendor who is ready and willing to perform."). Therefore, when the vendor is "ready, willing, and able to perform," and brings suit against a vendee who is refusing to perform, "the vendee may not assert the statute of frauds as an affirmative defense in an attempt to avoid the contract." Boyer, 915 P.2d at 1298-99.

Here, Plaintiffs were the sellers of the property, and Defendants were the alleged purchasers. According to the allegations in their Amended Complaint, Plaintiffs were "ready, willing, and able to perform" at the agreed-upon price of $15,585,000, and Defendants backed out. Id. at 1298. Under Colorado case law, Defendants, as the purchasers of the property, cannot now invoke the statute of frauds as a defense. Therefore, the motion to dismiss must be denied with respect to Count IV.

### 5.     Promissory estoppel

Finally, Plaintiffs argue that they are entitled to recovery under a promissory estoppel theory.

> The elements of a promissory estoppel claim are (1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice.

Cherokee Metro. Dist. v. Simpson, 148 P.3d 142, 151 (Colo. 2006).  In the Amended Complaint, Plaintiffs identify three separate promises made by Defendants that support a cause of action for promissory estoppel: that the parties would jointly develop the property, with Defendants acting as the money partner; that Defendants would purchase the property for $15,585,000; and that Defendants would pay for 75% of the building permit fees.  (Compl. ¶ 37.)

At the outset, Defendants argue that Plaintiffs cannot pursue a promissory estoppel claim here because the parties' relationship was governed by contract, and "[r]ecovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract."  Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C., 176 P.3d 737, 741 (Colo. 2007).  Plaintiffs do not dispute the validity of their contracts with Defendants, but nevertheless assert that Defendants breached promises not contained in those contracts.

17

The issue is thus whether Plaintiffs may bring a promissory estoppel claim for promises not contained in the enforceable contracts into which they entered with Defendants. "[P]romissory estoppel is applicable only in the absence of an otherwise enforceable contract. . . . The alternative remedy of promissory estoppel is never reached when there has been mutual agreement by the parties <u>on all essential terms of a contract</u>." <u>Scott Co. of Cal. v. MK-Ferguson Co.</u>, 832 P.2d 1000, 1003 (Colo. Ct. App. 1992) (internal citation omitted, emphasis added), <u>overruled on other grounds by</u> <u>Lewis v. Lewis</u>, 189 P.3d 1134 (Colo. 2008). According to the allegations of the Amended Complaint, the three promises Plaintiffs claim Defendants made that induced reasonable reliance on the part of Plaintiffs were not contained in any written contract. Whether the existence of enforceable contracts bars this theory of recovery thus depends on whether the alleged promises were part of the "essential terms" of any of the parties' contracts. <u>Scott Co.</u>, 832 P.2d at 1003; <u>see also</u> <u>Vigoda v. Denver Urban Renewal Auth.</u>, 646 P.2d 900, 905 (Colo. 1982) (holding that promissory estoppel "should be applied to prevent injustice where there has not been mutual agreement by the parties on all essential terms of a contract"). Therefore, if the alleged promises were not part of any of the contracts' essential terms, Plaintiffs may still have a viable promissory estoppel claim for those promises not covered by the contracts. <u>See</u> <u>Boyer</u>, 915 P.2d at 1300-01 (recognizing as a "promissory estoppel question" whether the defendant "made any promises <u>subsequent to</u>

the formation of the contract upon which [the plaintiff] relied to his detriment" (emphasis added)).

The Amended Complaint alleges the existence of several written agreements between Plaintiffs and Defendants: three promissory notes (and related deeds of trust), in which Defendants provided capital to fund acquisition of the property and 75% of predevelopment expenses (Am. Compl. ¶ 12); a letter of intent, executed in March 2007, which specified how the Take-Out Entity the parties intended to form would be funded (id. ¶ 16); a Forbearance Agreement in which BlackRock agreed to forego remedies it believed it had under the promissory notes (id. ¶ 19); a second letter of intent, executed in December 2007, that restated most of the terms of the first letter (id. ¶ 21); and an Amended and Restated Forbearance Agreement, which included a provision requiring Plaintiffs to deal exclusively with Defendants (id. ¶ 22). The court now turns to considering whether Plaintiffs' various claims of promissory estoppel are barred by the existence of any of these contracts between Defendants and Plaintiffs and, if they are not barred, whether the claims state a cause of action on which relief can be granted.

### a.   Promise to develop the property jointly

The Complaint alleges that the parties signed two "letters of intent" that contemplated the joint development of the property. (Id. ¶¶ 16, 21.) It is unclear from the Complaint whether these letters of intent constituted contracts between the parties or whether the parties intended for them to be nonbinding. If these letters were in fact

19

contracts, then they may preclude a promissory estoppel claim because the letters may cover the "essential terms" of the agreement between the parties to develop the property jointly. The Amended Complaint never refers to them as contracts, however, and, drawing all reasonable inferences in favor of Plaintiffs, the court must conclude that they are not. Sunrise Valley, LLC, 528 F.3d at 1254. At this stage in the litigation then, this promissory estoppel claim is not barred by the alleged existence of other contracts between the two parties. See Southern Colo. MRI, Ltd. v. Med-Alliance, Inc., 166 F.3d 1094, 1099 (10th Cir. 1999) (holding that, under Colorado law, "where a letter of intent exists, the ultimate question of whether the parties formed a contract remains 'a question of fact to be determined by all of the surrounding circumstances'" (quoting James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail, 892 P.2d 367, 372 (Colo. Ct. App. 1994))).

### b. Promise to purchase the property for $15,585,000

Plaintiffs also claim that they reasonably relied, to their detriment, on Defendants' promise to purchase the property for $15,585,000. This claim is pled in the alternative to Plaintiffs' breach of contract claim; if a valid contract existed between the parties, as alleged in the breach of contract claim, then a promissory estoppel claim would be barred. See Wheat Ridge Urban Renewal Auth., 176 P.3d at 741. Pleading in the alternative is permitted in the federal system, and consistency is not required. See Fed.

R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency.").

Defendants argue that Plaintiffs failed to allege that they relied on Defendants' promise to purchase the property at $15,585,000. The alleged promise was made in mid-August 2008, and Defendants changed their minds on or about August 26, 2008, so Plaintiffs' reliance must have been in that brief window. Plaintiffs did allege that they demonstrated reasonable reliance by "foregoing the potential sale or development of the property with other parties." (Am. Compl. ¶ 63.) Plaintiffs will ultimately have to prove that they did in fact rely on Defendants' promise and did not seek alternative buyers during those two weeks, but Plaintiffs' allegation that they did so suffices for purposes of this motion.

### c.    Promise to pay 75% of the building permit fees

Plaintiffs' final promissory estoppel claim alleges that Plaintiffs relied, to their detriment, on Defendants' promise to pay 75% of the building permit fees. The Amended Complaint alleges that Plaintiffs advised Defendants about the need to obtain building permits, and "Defendants agreed that the building permits and municipal fees should be paid and promised to pay 75% of these costs." (Am. Compl. ¶ 24.) Despite this promise, which is not alleged to have existed in any written contract, Defendants did not pay for the building permits, and Plaintiffs had to pay "pre-development expenses, including the building permit fees." (Id. ¶ 63.) Defendants again argue that the release

bars this claim, but for the reasons stated above, the court cannot consider the applicability of the release in deciding whether Plaintiffs properly stated a claim. Therefore, this theory remains viable at the present stage of the litigation.

### C. BlackRock

Defendants also argue that Plaintiffs' claims are only brought against Tower, not BlackRock. However, the Amended Complaint consistently refers to promises made, and actions taken, by "Defendants." In addition, Plaintiffs alleged that "Tower is owned and controlled by BlackRock" (Am. Compl. ¶ 4), and, drawing all reasonable inferences in favor of Plaintiffs, it is plausible that liability could attach to both entities for the harms alleged. Cf. First Horizon Merchant Servs., Inc. v. Wellspring Capital Mgmt., LLC, 166 P.3d 166, 177 (Colo. Ct. App. 2007) (permitting, under some circumstances, a principal to be liable for the actions of a subsidiary "[i]f [the] subsidiary is merely an alter ego of the principal"). Plaintiffs have therefore adequately pleaded liability on the part of BlackRock.

## III. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is denied.

Dated this ____14th____ day of _____May_____, 2010.

BY THE COURT:

*s/ David M. Ebel*

_____

U. S. CIRCUIT COURT JUDGE

22